**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------

**13 CV 9033**

THOMAS JORDAN, TYMEL JORDAN, and
ISHMAEL DABOR,

INDEX NO.
**ECF CASE**

                                               Plaintiffs,

**JURY TRIAL DEMANDED**

- against -

THE CITY OF NEW YORK, a municipal entity, NEW
YORK CITY SENIOR POLICE ADMINISTRATIVE
AID CELESTE WHEELER, NEW YORK CITY
DEPUTY INSPECTOR MILTIADIS MARMARA,
NEW YORK CITY POLICE OFFICER FERNANDEZ,
NEW YORK CITY POLICE OFFICER MARTINEZ,
and NEW YORK CITY POLICE OFFICERS "JOHN
DOES 1-15,"

**COMPLAINT**

**JUDGE RAMOS**

                                      Defendants.
-------------------------------------------------------------------X

Plaintiffs bring this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their

civil rights, as said rights are secured by said statutes and by the Constitution of the

United States.  Plaintiffs allege the following on information and belief.

## I.   PRELIMINARY STATEMENT

       1.        On the afternoon of February 1, 2013 at or around 3:00pm, Plaintiffs were

in a car and traveling through Queens, New York. Plaintiffs' car was near the intersection

of Linden Boulevard and 159th Street when three members of the New York City Police

Department ("NYPD") pulled Plaintiffs over without cause. The officers approached

Plaintiffs' car and instructed Plaintiffs and other individuals within the car to give their

IDs. Plaintiffs complied. After returning to their marked NYPD vehicle for a few

minutes, the officers returned to Plaintiffs car, removed Plaintiffs from their car, and

handcuffed and arrested them, without probable cause for doing so. Several additional officers and police vehicles arrived to the scene. The officers, in more than once instance, slammed Plaintiffs against nearby police vehicles. Neither the Plaintiffs, nor anyone else in Plaintiffs' car, had committed any crime or offense.

2.      Plaintiffs were transported to the 113th Precinct ("the Precinct") and were searched, photographed, fingerprinted, and put into holding cells. The officers kept Plaintiffs handcuffed for several hours. While Plaintiffs were in the Precinct they were attacked by several as-yet named officers. These officers, amongst other uses of force, punched and kicked the Plaintiffs multiple times; threw and pinned Plaintiffs against the floor of the Precinct; and slammed Plaintiffs against multiple objects within the Precinct. Plaintiffs were charged with crimes and violations that they did not commit.

3.      Approximately twenty-four (24) hours after their arrest, Plaintiffs were arraigned and released on their own recognizance. Upon release, Plaintiffs sought medical treatment for their injuries. Plaintiffs were force to appear before the Court on February 27, 2013, when all charges against Plaintiffs were Adjourned in Contemplation of Dismissal. All charges against Plaintiffs were dismissed on or around August 26, 2013.

4.      Plaintiffs now seek fair and just compensation for Defendants' egregious and flagrant violations of their civil rights.

## II.    JURISDICTION

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

## III.    VENUE

6.      Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the named defendants are residents of this district pursuant to 28 U.S.C. § 1391(c)(2).

## IV.    JURY DEMAND

7.      Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

**COMPLIANCE WITH GENERAL MUNICIPAL LAW § 50-I**

8.      Notices of claim were made and served upon the City of New York in compliance with section fifty-e of this chapter, and at least thirty days have elapsed since the service of such notices and adjustment or payment thereof have been neglected or refused, and this action or special proceeding is commenced within one year and ninety days after the happening of the events upon which the claims are based.

## V.    THE PARTIES

9.      Plaintiff THOMAS JORDAN is an African-American male, and at all times relevant to this action, was and is a resident of the City and State of New York, in the County of Queens.

10.     Plaintiff TYMEL JORDAN is an African-American male, and at all times relevant to this action, was and is a resident of the City and State of New York, in the County of Queens.

11.     Plaintiff ISHMAEL DABOR is an African-American male, and at all times relevant to this action, was and is a resident of the City and State of New York, in the County of New York

12.     Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

13.     Defendant THE CITY OF NEW YORK maintains the New York City Police Department (the "NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, the City of New York.

14.     At all times relevant to this action, the individually named Defendant NEW YORK CITY SENIOR POLICE ADMINISTRATIVE AID CELESTE WHEELER ("Defendant SENIOR POLICE AID WHEELER") was a duly sworn senior police administrative aid of the Queens Court Section of said department and was acting under the supervision of said department and according to her official duties.

15.     At all times relevant to this action, the individually named Defendant NEW YORK CITY POLICE OFFICER FERNANDEZ ("Defendant POLICE OFFICER FERNANDEZ") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties.

16.     At all times relevant to this action, the individually named Defendant NEW YORK CITY POLICE OFFICER MARTINEZ ("Defendant POLICE OFFICER

MARTINEZ") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties.

17.     At all times relevant to this action, the individually named Defendant NEW YORK CITY DEPUTY INSPECTOR MILTIADIS MARMARA ("Defendant DEPUTY INSPECTOR MARMARA"), was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

18.     At all times relevant to this action, Defendant DEPUTY INSPECTOR MARMARA was the commanding officer for the 113th Precinct; and thus held supervisory authority over each of the Defendants, both named and un-named, herein.

19.     At all times relevant to this action, each of the Defendant POLICE OFFICERS "John Does 1-15" were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

20.     The Defendant POLICE OFFICERS "John Does 1-7" along with Defendant POLICE OFFICER FERNANDEZ and Defendant POLICE OFFICER MARTINEZ were those officers who pulled over Plaintiffs or were there at the time of Plaintiffs' arrest.

21.     The Defendant POLICE OFFICERS "John Does 8-15", along with Defendant DEPUTY INSPECTOR MARMARA were those officers who attacked Plaintiffs at the 113th Precinct.

22.     Plaintiffs will amend this complaint to name each of the individual

Defendant POLICE OFFICERS "John Does 1-15" as their identities can be established to

a reasonable certainty.

## VI.   FACTS

23.     At or around 3:00pm Plaintiff THOMAS JORDAN, TYMEL JORDAN,

and ISHMAEL DABOR were traveling in a car ("Plaintiffs' car" or alternatively "the

car") through Queens, New York.

24.     Plaintiffs THOMAS JORDAN's and TYMEL JORDAN's mother was

also in the car.

25.     A family friend of Plaintiffs was driving the car, and held a valid drivers

license to do so.

26.     As Plaintiffs' car approached the intersection of 159th Street and Linden

Boulevard, a marked NYPD vehicle pulled plaintiffs over without justification or cause.

27.     The car's driver pulled over right away.

28.     Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE

OFFICER MARTINEZ, and Defendant POLICE OFFICER "John Doe 1" stepped out of

the NYPD vehicle and approached Plaintiffs' car.

29.     These Defendant POLICE OFFICERS ask the car's driver to produce her

identification.

30.     The same Defendant POLICE OFFICERS asked the Plaintiffs, and

everyone else in the car, to produce their IDs.

31.     Upon information and belief, the Defendant POLICE OFFICERS did not have any legal justification for requesting the identifications of everyone in the Plaintiffs' car.

32.     Nonetheless, everyone in Plaintiffs' car complied, and handed their identifications over to the Defendant POLICE OFFICERS.

33.     The Defendant POLICE OFFICERS returned to their NYPD vehicle.

34.     After a time, Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE OFFICER MARTINEZ, and Defendant POLICE OFFICER "John Doe 1" returned to Plaintiffs' car.

35.     Plaintiffs asked Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE OFFICER MARTINEZ, and Defendant POLICE OFFICER "John Doe 1" why they had been pulled over.

36.     The Defendant POLICE OFFICERS indicated that an air-freshener —— shaped as a tree and scented to emit a strawberry aroma —— was hanging from the car's rear-view mirror and obstructing the driver's view.

37.     The Defendant POLICE OFFICERS told Plaintiffs that they were pulled over due to, in sum and substance, "obstruction of view."

38.     Upon information and belief, the Defendant POLICE OFFICERS were referring to N.Y. Vehicle and Traffic Law § 1213, "Obstruction to driver's view or driving mechanism."

39.     N.Y. VAT Law § 1213 makes it unlawful for an individual to:

(a) Drive a motor vehicle when it is so loaded, or when there are in the front seat such number of persons as to obstruct the view of the driver to the front or sides of the vehicle or as to interfere with the driver's control over the driving mechanism of the vehicle. In no event shall there be more than three persons in the front seat of any vehicle, except

7

where such seat has been constructed to accommodate more than three persons and there is eighteen inches of seating capacity for each passenger or occupant in said front seat.

(b) No passenger in a vehicle shall ride in such a position as to interfere with the driver's view ahead or the sides, or to interfere with his control over the driving mechanism of the vehicle.

40.    The view of the car's driver was in no way obstructed.

41.    There were only two people —— the car's driver and Plaintiff TYMEL

JORDAN —— in the front seats of Plaintiffs' car.

42.    Not one of the passengers of Plaintiffs' car was seated "in such a position

to interfere with the driver's view ahead or to the sides, or to interfere with [her] control

over the driving mechanism of the vehicle."

43.    Upon information and belief, the Defendant POLICE OFFICERS'

proffered "obstruction of view" reason for pulling Plaintiffs over was false and pre-

textual.

44.    Upon information and belief, the Defendant POLICE OFFICERS stopped

Plaintiffs because Plaintiffs were young black men driving through Queens, New York.

45.    Upon information and belief, the Defendant POLICE OFFICERS stopped

Plaintiffs because Defendants knew that they could stop Plaintiffs, make-up charges

against them, arrest them, subject them to excessive force, and detain them at length

without suffering any adverse employment actions, or even verbal reprimands from their

employer, the NYPD or Defendant THE CITY OF NEW YORK.

46.    NYPD police officers can only arrest a person if they reasonably suspect

or believe that he has committed an offense.[1]

---

[1] The NYPD Patrol Guide, Subsection 202-25 9(a-e).

47.     The Defendant POLICE OFFICERS did not have a reasonable suspicion or probable cause to believe that Plaintiffs, or anyone within Plaintiffs' car, had committed, were committing, or were about to commit an offense.

48.     At or around this time, several additional NYPD vehicles and officers arrived at the scene, including but not limited to, the Defendant POLICE OFFICERS "John Does 2-7."

49.     Neither Plaintiffs, nor anyone within Plaintiffs' car, had committed, was committing, or was about to commit an offense of any kind or sort.

50.     Nonetheless, the Defendant POLICE OFFICERS pulled Plaintiffs' out of the car without probable cause to search either the Plaintiffs or the car.

51.     Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE OFFICER MARTINEZ, and/or one or more of the Defendant POLICE OFFICERS "John Does 1-7" yanked Plaintiffs out of the car, using more force than was necessary to do so.

52.     Plaintiffs' were handcuffed and walked toward nearby police vehicles.

53.     Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE OFFICER MARTINEZ, and/or one or more of the Defendant POLICE OFFICERS "John Does 1-7" slammed Plaintiffs against the hood of one or more nearby police vehicles.

54.     Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE OFFICER MARTINEZ, and/or one or more of the Defendant POLICE OFFICERS "John Does 1-7" POLICE OFFICERS sat Plaintiffs down on the ground.

55.     Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE OFFICER MARTINEZ, and each of the Defendant POLICE OFFICERS "John Does 1-

7" chose not to intervene on Plaintiffs' behalf so as to prevent the violation of their constitutional rights.

56.     Plaintiffs were placed in police vehicles and transported to the 113th Precinct.

<u>PLAINTIFFS ARRIVE AT THE 113TH PRECINCT, REMAIN HANDCUFFED FOR SEVERAL HOURS, AND ARE BRUTALLY ATTACKED BY DEFENDANTS</u>

57.     Upon arrival at the 113th Precinct, Plaintiffs were fingerprinted, photographed, and searched.

58.     Plaintiffs' handcuffs were not removed throughout the time that Plaintiffs were held within the 113th Precinct.

59.      Plaintiffs suffered physical and mental pain from wearing tight metal handcuffs around their wrists for approximately five (5) to seven (7) hours.

60.      After Plaintiffs were walked into the Precinct, Plaintiffs asked one or more of the Defendant POLICE OFFICERS "John Does 8-15" why they had been arrested.

61.     The Defendant POLICE OFFICERS "John Does 8-15" did not give Plaintiffs any information.

62.     Instead, the Defendant POLICE OFFICERS "John Does 8-15" and Defendant DEPUTY INSPECTOR MARMARA brutally attacked the Plaintiffs.

63.     Sometime after Plaintiffs arrived at the Precinct, Plaintiffs THOMAS JORDAN's and TYMEL JORDAN'S mother arrived at the Precinct to get more information about Plaintiffs' arrests.

64.     At or around this time, Plaintiffs TYMEL JORDAN and THOMAS

JORDAN were handcuffed and standing near an area of the Precinct visible from the

Precinct's front desk.

65.     The Defendant POLICE OFFICERS "JOHN DOES 8-15" and Defendant

DEPUTY INSPECTOR MARMARA attacked Plaintiffs TYMEL JORDAN and

THOMAS JORDAN in front of their mother, causing Plaintiffs to suffer physical,

mental, and emotional injuries as a result.

66.     Plaintiffs TYMEL JORDAN's and THOMAS JORDAN's mother

witnessed some or all of the Defendant POLICE OFFICERS' "John Does 8-15" and

Defendant DEPUTY INSPECTOR MARMARA's brutal attack of Plaintiffs.

67.     Plaintiffs TYMEL JORDAN and THOMAS JORDAN asked one or more

of the Defendant POLICE OFFICERS "John Does 8-15" why they had been arrested.

68.     One of the Defendant POLICE OFFICERS "John Does 8-15" and

Defendant DEPUTY INSPECTOR MARMARA told Plaintiffs TYMEL JORDAN and

THOMAS JORDAN to, in sum and substance, "Shut the F--k up."

69.     At or around this time, one or more of the Defendant POLICE OFFICERS

"John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA jumped on

Plaintiffs TYMEL JORDAN and THOMAS JORDAN.

70.     Plaintiffs TYMEL JORDAN and THOMAS JORDAN fell to the ground

as a result.

71.     One or more of the Defendant POLICE OFFICERS "John Does 8-15"

and/or Defendant DEPUTY INSPECTOR MARMARA repeatedly punched Plaintiffs

TYMEL JORDAN and THOMAS JORDAN.

72.     One or more of the Defendant POLICE OFFICERS "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA repeatedly kicked Plaintiffs TYMEL JORDAN and THOMAS JORDAN.

73.     One or more of the Defendant POLICE OFFICERS "John Does 8-15" and Defendant DEPUTY INSPECTOR MARMARA picked up Plaintiff TYMEL JORDAN and slammed Plaintiff TYMEL JORDAN's head against a glass partition within the Precinct.

74.     Throughout the Defendant POLICE OFFICERS' "John Does 8-15" and Defendant DEPUTY INSPECTOR MARMARA's brutal attack, Plaintiffs TYMEL JORDAN and THOMAS JORDAN were handcuffed, and thus completely defenseless.

75.     Plaintiffs TYMEL JORDAN and THOMAS JORDAN suffered physical and mental injuries as a result of the Defendant POLICE OFFICERS' "John Does 8-15" and Defendant DEPUTY INSPECTOR MARMARA's brutal attack.

76.     Plaintiff TYMEL JORDAN was transferred to Jamaica Hospital for medical treatment.

THE DEFENDANT POLICE OFFICERS "JOHN DOES 8-15" AND DEFENDANT DEPUTY INSPECTOR MARMARA ATTACK PLAINTIFF ISHMAEL DABOR, CAUSING PLAINTIFF TO VOMIT, AND REQUIRE MEDICAL ATTENTION

77.     Plaintiff ISHMAEL DABOR arrived at the 113th Precinct sometime after Plaintiffs TYMEL JORDAN and THOMAS JORDAN.

78.     Plaintiff ISHMAEL DABOR asked one or more of the Defendant POLICE OFFICERS "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA why he had been arrested.

79.     Defendants did not respond to Plaintiff ISHMAEL DABOR's question.

80.     Instead, one or more of the Defendant POLICE OFFICERS "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA repeatedly punched Plaintiff ISHMAEL DABOR in his head.

81.     One or more of the Defendant POLICE OFFICERS "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA repeatedly punched Plaintiff ISHMAEL DABOR in his stomach.

82.     One or more of the Defendant POLICE OFFICERS "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA threw Plaintiff ISHMAEL DABOR onto the floor within the Precinct.

83.     One or more of the Defendant POLICE OFFICERS "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA picked up Plaintiff ISHMAEL DABOR and slammed his head against a wall within the Precinct.

84.     Throughout the Defendant POLICE OFFICERS "John Does 8-15" and Defendant DEPUTY INSPECTOR MARMARA's brutal attack, Plaintiff ISHMAEL DABOR was handcuffed, and thus completely defenseless.

85.     Plaintiff ISHMAEL DABOR began to vomit as a result of the Defendant POLICE OFFICERS' "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA's brutal attack.

86.     Plaintiff ISHMAEL DABOR requested that Defendants transfer him to a hospital to receive treatment for his injuries.

87.     The Defendant POLICE OFFICERS "John Does 8-15" and/or Defendant DEPUTY INSPECTOR MARMARA denied Plaintiff ISHMAEL DABOR's request for medical treatment.

88.     Plaintiff ISHMAEL DABOR continued to suffer as a result.

**DEFENDANTS TRANSFER PLAINTIFFS TO CENTRAL BOOKING, PLAINTIFFS ARE ARRAIGNED, CHARGED WITH CRIMES AND VIOLATIONS THAT THEY DID NOT COMMIT, AND RELEASED ON THEIR OWN RECOGNIZANCE**

89.     At or around 12:00am on February 2, 2013, Plaintiffs were transported to Queens Central Booking.

90.     There the Defendant POLICE OFFICERS held Plaintiffs until approximately 3:00pm that afternoon, approximately twenty-four (24) hours after Plaintiffs were arrested.

91.     The Defendant POLICE OFFICERS caused baseless charges to be brought against Plaintiffs.

92.     The Defendant POLICE OFFICERS charged Plaintiffs under N.Y. Penal Law § 195.05, Obstruction in the Governmental Administration in the Second Degree ("O.G.A.2"), a Class A misdemeanor.

93.     Plaintiffs did no such thing, nor did Plaintiffs commit any other crime or offense.

94.     The Defendant POLICE OFFICERS charged Plaintiffs under N.Y. Penal Law § 205.30, Resisting Arrest, a Class A misdemeanor.

95.     Plaintiffs did no such thing, nor did Plaintiffs commit any other crime or offense.

96.     The Defendant POLICE OFFICERS charged Plaintiffs under N.Y. Penal Law § 240.20(1), Disorderly Conduct, a violation.

97.     Plaintiffs did no such thing, nor did Plaintiffs commit any other crime or offense.

98.     Defendant SENIOR POLICE AID WHEELER falsely swore out the criminal complaint against Plaintiffs.

99.     Defendant POLICE OFFICER FERNANDEZ falsely swore out the supporting deposition for the baseless charges brought against Plaintiffs.

100.    Plaintiffs were arraigned at or around 3:00pm on February 2, 2013.

101.    Plaintiffs were released on their own recognizance.

102.    Plaintiffs were forced to appear before the Court on February 27, 2013.

103.    Plaintiffs received adjournments in contemplation of dismissal ("ACDs") on that date, February 27, 2013.

104.    On or around August 26, 2013, all charges against Plaintiffs were dismissed.

105.    As a result of the Defendants' conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

106.    As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## VII.  CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF PLAINTIFFS' CIVIL RIGHTS UNDER 42 U.S.C. 1983
### AGAINST ALL DEFENDANTS

107.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

108.    The Defendant THE CITY OF NEW YORK and its agents, servants and employees, including but not limited to Defendant POLICE AID WHEELER, Defendant DEPUTY INSPECTOR MARMARA, Defendant POLICE OFFICER FERNANDEZ, Defendant POLICE OFFICER MARTINEZ, and the Defendant POLICE OFFICERS "John Does 1-15" (collectively, the "Individual Defendants"), deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

109.    In so doing, the Defendants acted under color of state law, and in accordance with the customs, practices, procedures or rules of the Defendant THE CITY OF NEW YORK.

110.    The Individual Defendants acted in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

111.    Defendant THE CITY OF NEW YORK and the New York City Police Department are responsible for the actions of their employees under the doctrine of *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978), and/or the doctrine of respondeat superior.

112.    Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

113.    As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**FALSE ARREST AND IMPRISONMENT**
**UNDER 42 U.S.C § 1983**
**AGAINST ALL DEFENDANTS**

114.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

115.    Plaintiffs were arrested extrajudicially, without a warrant, and without probable cause.

116.    Plaintiffs were held in custody against their will and without justification.

117.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

118.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**EXCESSIVE FORCE**
**UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

119.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

120.    The Individual Defendants used force against Plaintiffs that was greater than that which was objectively reasonable under the circumstances.

121.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputations and standings within their communities.

122.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### FOURTH CLAIM FOR RELIEF
### FAILURE TO INTERVENE
### AGAINST THE INDIVIDUAL DEFENDANTS

123.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

124.    The Individual Defendants, to the extent that they did not directly participate in the unlawful conduct of other Defendant Police officers, were present when such unlawful conduct occurred.

125.    These individual Defendant Police Officers had a duty and a realistic opportunity to intervene to prevent the unlawful conduct of the other Defendant Police Officers, but failed to do so.

126.    In choosing not to intervene, these individual Defendant Police Officers were deliberately indifferent to a substantial risk of harm to Plaintiffs.

127.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

128.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### EQUAL PROTECTION UNDER 42 U.S.C. §1983

129.     Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above with the same force and effect as if fully set forth herein.

130.     That at all times described herein, Plaintiffs were possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

131.     The Defendants subjected Plaintiffs to assault, battery, use of excessive force, unlawful arrest, and other violations of Plaintiffs' Constitutional rights in the manner described herein because they knew that they could do so with impunity.

132.     The Defendants particular acts of subjecting Plaintiffs to assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiffs' constitutional rights in the manner described herein, were the result of a perceived ease of charging and prosecuting minority, working-class individuals with crimes and/or violations in order to cover up for constitutionally-violative conduct.

133.     The Defendants undertook the particular actions described herein against Plaintiffs because Plaintiffs are African-American, and therefore the Defendants knew that they could undertake these actions with impunity.

134.     As a result of the aforementioned conduct, the Defendants violated Plaintiffs' constitutional rights to equal protection under the law.

135.     Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY UNDER *MONELL* UNDER 42 U.S.C. §1983**
**ARISING FROM UNCONSTITUTIONAL MUNICIPAL**
**POLICIES AND CUSTOMS**

136.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

*A.   The NYPD Compels its Officers to Meet
Unlawful Arrest Quotas, Compelling Thousands of
Baseless and Unlawful Arrests*

137.     The NYPD places emphasis on numbers-driven street-level enforcement of minor violations.[2]

138.     Indeed, the use of an explicit quota system has been documented at precincts in Brooklyn.[3]

139.     This quota system is enforced by the very top levels of the NYPD through the Department's Compstat system.

140.     In a full-page ad on page 15 of the May 7, 2012 edition of the New York Daily News, The Patrolmen's Benevolent Association made clear that the quota pressure comes from the top.  Referring to these quotas, the ad is headlined: "Don't Blame the Cop, Blame NYPD Management."

141.     The NYPD uses Compstat to track such enforcement actions statistically.

142.     The NYPD holds weekly crime strategy meetings, "Compstat Meetings," at which such reports are discussed.[4]

143.     Compstat Meetings are attended by all commanders of Precincts, Police Service Areas, Transit Districts and other operational unit commanders within a given

---

[2] Floyd v. City of New York, et al., [City of New York's Local Civil Rul e56.1 Statement of Undisputed Facts, 08cv0134 (SAS) [SDNY], docket number 144, filed 2/24/2011, paragraphs 116-131.
[3] "Cops at Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-11-08/local/27080554_1_memos-quotas-seat-belt.
[4]     *Id.*

Patrol Borough, including the commanding officers and /or supervisors of precinct-based and specialized investigative units.[5]

144.    Also in attendance are representatives from the District Attorneys' Offices as well as Transit and Housing Bureau Commanders whose jurisdictions lie within the patrol borough, Crime Strategy Coordinators from other patrol boroughs, and ranking officers from a variety of support and ancillary units (such as the Legal Bureau which do not perform direct enforcement functions.).[6]

145.    The purpose of these Compstat Meetings is for the commanders to direct and modify street-level law enforcement policy based on Compstat statistics.[7]

146.    At these weekly Compstat Meetings, commanders either ratify that the statistics show that the NYPD's street-level activities are correctly implementing the NYPD's stated policies, or street-level deployments are modified to bring these activities in line with such policies.[8]

147.    In this way, the highest-level command of the NYPD exercises granular control over summonses and arrests for minor violations and quality of life offenses, as well as for stop, question and frisk activity.[9]

148.    What street-level police officers do is a direct result of these command-level policies.

149.    As the New York Daily News reported, NYPD supervisors give explicit instructions to street-level enforcement personnel that quantity, not quality, matters – promulgating a policy that comes from the very top of the NYPD hierarchy. [10]

---

[5]      *Id.*
[6]      *Id.*
[7]      *Id.*
[8]      *Id*.
[9]      *Id*.

150.     Individual officers have stepped forward to denounce the NYPD's use of quotas, which are illegal.[11]

151.     Officers that refuse to meet illegal quotas are subject to adverse employment actions and other retribution from their superiors.[12]

152.     The NYPD officially denies that it maintains and enforces quotas.

153.     However, the existence of this unconstitutional arrest quota custom and/or policy has been shown by the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn .[13]

154.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by WABC-TV/DT, in which a 41st precinct sergeant explains that each of his officers is held to a twenty summons per month, and one arrest per month, enforcement quota.[14]

155.     The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from a video featuring NYPD Police Officer Adhyl Polanco, referring to the "1 arrest / 20 summons / 5 stop and Frisks" monthly mandate from his supervising officers.[15]

---

[10]     Parascandola, Rocco, "Cops On Tape Pushing Arrest Quotas: NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas," The New York Daily News, March 3, 2011.

[11]     *Id*.

[12]     See id.

[13]     Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://articles.nydailynews.com/2010-11-08/local/27080554_1_memos-quotas-seat-belt.

[14]     Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

[15] Where I Am Going.org, Video Available online at: http://www.youtube.com/watch?v=tt4O62_VXs4

156.    The mandate requires officers to make at least one arrest, issue twenty summonses, and stop question and frisk at least five people, each month.[16]

157.    Thus, officers are required to stop someone twenty-six days out of twenty-eight, twenty-nine, thirty, or thirty-one days for a calendar month. In practice, this requires officers to stop at least one person, nearly every day in which they work.[17]

158.    The existence of the aforesaid unconstitutional arrest quota custom and policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make quota-driven arrests as directed by their superiors even if they must void the arrests at the end of their shifts.[18]

B.    *The NYPD Tolerates and Condones*
*Widespread Police Perjury*

159.    NYPD policy rewards arrests that are based on false statements in criminal complaints sworn by NYPD officers.

160.    As United States District Court Judge Jack Weinstein wrote: "Informal inquiry by [myself] and among the judges of this court, as well as knowledge of cases in other federal and state courts ... has revealed anecdotal evidence of repeated, widespread falsification by arresting officers of the New York City Police Department."[19]

---

[16] *Id.*

[17] *Id.*

[18]    Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town."  Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

[19]    Marzulli, John, "Judge Jack Weinstein rips NYPD on false arrests as brothers sue for $10M over wrongful narcs bust," The New York Daily News, Nov. 30, 2009.

161.    By its nature, the true extent of police perjury has not been documented. The Mollen Commission in the 1990's found that police perjury was so pervasive that the police even had a word for it: "testilying."[20]

162.    Police perjury often involves lying about matters that are outcome determinative in litigation, and that go to the heart of a defendant's guilt or innocence.[21]

163.    Certain types of arrests occur with such frequency that the pattern and practice of police perjury has been at least partially exposed.

164.    In 2008, the New York Times documented at least 20 cases in federal court in which police provided false boilerplate testimony to justify searches and seizures of guns.  These cases represented only that small fraction of cases in which the boilerplate testimony could be challenged with more than the word of the defendant.[22]

165.    The NYPD has taken no steps to disincentivize – much less punish – the practice of perjury that underlies these arrests.  Indeed, the number of such arrests continues to increase.[23]

166.    Nor has the NYPD taken any steps to punish police perjury in other contexts.

167.    There is a nexus between arrest quotas and the NYPD's toleration of police perjury: **police under pressure to make their quota of arrests make false arrests based on perjured accusations in order to do so**.[24]

---

[20]     Cunningham, Larry, "Taking on Testilying: The Prosecutor's Response to In-Court Police Deception," *Criminal Justice Ethics* Winter/Spring 2009.
[21]     *Id*.
[22]     Weiser, Benjamin, "Police in Gun Searches Face Disbelief in Court," May 12, 2008.
[23]     Parascandola, Rocco and Sarah Armaghan, "Arrests for low-level pot possession higher in 2011 than 2010, despite NYPD directive restricting busts Marijuana arrests near an all-time high," The New York Daily News, February 2, 2012; Beekman, Daniel, Study claims NYPD made hundreds of unlawful pot arrests," The New York Daily News, April 03, 2012.

### C.   The NYPD Unlawfully Charges Innocent People
### with "Cover" Charges to Punish Contempt of Cop

168.    Upon information and belief, police officers in the City of New York make arrests in the absence of the commission of any crime by the person arrested, motivated by a desire to punish the arrestee for the arrestee's perceived failure to display the degree of deference or subservience demanded by the arresting officers.

169.    Such arrests are frequently referred to as "**contempt of cop**" arrests.

170.    In order to conceal the illegality of these arrests, the victim of the unlawful arrest is charged with a "**cover charge**," usually a low-level crime which does not require a complainant, and whose elements can be established, for the purposes of a criminal complaint, by the officer's own perjured affidavit or testimony.

171.    NYPD police officers have a pattern and practice of charging one or more of a trinity of offenses as their favored cover charges: disorderly conduct, resisting arrest, and obstruction of governmental administration.

172.    The plaintiffs herein were charged with those same three offenses: disorderly conduct, resisting arrest, and obstruction of governmental administration.

173.    However, other charges that require no complainant, such as quality of life infractions like open container or excessive noise violations, are also used to cover false arrests.

---

[24]     Marzulli, John, "We fabricated drug charges against innocent people to meet arrest quotas, former detective testifies," The New York Daily News,  October 13th 2011.

174.    The New York Times published a special report on the incidence of police brutality as a response to perceived "contempt of cop" by residents of the City of New York, and documented officers' use of cover charges in such cases.[25]

175.    The NYPD has never undertaken any internal study of contempt of cop arrests or cover charges, and statistics on these practices are not available.  However, there is extensive evidence of a widespread practice of false cover charges.

176.    In a case profiled by the CCRB, that board substantiated a quintessential contempt-of-cop/cover charge false arrest: "The board also determined that the second officer improperly drew his gun, failed to provide his name as required by the department's Patrol Guide, and lacked probable cause to issue the disorderly conduct summons, a summons motivated by the man's challenging the officers' actions."[26]

177.    In another such case, the CCRB found that a detective struck a man in the back of the head with a gun when the man questioned the detective.  The man was charged with disorderly conduct, which charges were dismissed.[27]

178.    In another such case, the CCRB found that without legal justification an officer arrested a man who accidentally bumped into him on the street.  The CCRB found that the officer issued the man a summons charging him with disorderly conduct, and the officer told him, "You're lucky I didn't beat the shit out of you." A court dismissed the disorderly conduct summons.[28]

---

[25]    Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report: Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://www.nytimes.com/1997/11/19/nyregion/challenge-to-authority-a-special-report-disrespect-as-catalyst-for-brutality.html?pagewanted=all.
[26]    CCRB Case Profiles, available at http://www.nyc.gov/html/ccrb/html/profiles.html (last visited May 15, 2012).
[27]    Id.
[28]    Id.

179.    Indeed, many arrests in violation of the Consent Decree in **Black v. Codd** are also Contempt of cop arrests where "cover charges" are the only charges filed.

180.    Defendant City of New York and the New York Police Department continue to resist calls for disclosure statistics concerning minor crimes such as the typical "cover charge" crimes.[29]

181.    The NYPD's failure to respond to this well documented problem, and its obstruction of efforts of outside parties to document and address this issue, amount to ratification of the pattern and practice of contempt of cop arrests and excessive force, justified by false cover charges, by the NYPD's agents, employees, and officers.

### D.   The NYPD Has a Policy and Practice of Tolerating Police Misconduct

182.    When the Civilian Complaint Review Board substantiates claims of police misconduct, The NYPD usually does **not** follow the board's recommendations that officers guilty of misconduct be given the most serious penalty. From 2002 to 2010, the board recommended that 2,078 officers receive the most severe penalty. That suggested discipline was given to only 151 officers.[30]   Thus, the Department has set a policy that the consequences of misconduct will be mild or nonexistent.

183.    This pattern of toleration of violent police misconduct by the NYPD is a policy and practice of long standing: in 2007, the New York Civil Liberties Union found that the NYPD's practice of "condoning" police misconduct actually got worse over the period of time studied (1994-2006).   The NYCLU researchers found:

---

[29] Rivera, Ray and Baker, Al, "Data Elusive on Low-Level Crime in New York City," The New York Times, Nov. 1, 2010.  Article incorporated by reference herein and available online at http://www.nytimes.com/2010/11/02/nyregion/02secrecy.html?pagewanted=all.
[30]    Baker, Al, "Independent Agency Gets New Powers to Prosecute New York Police Officers," March 27, 2012.

◆    Of the more egregious cases of misconduct that have been substantiated by the CCRB and referred to the NYPD for disciplinary action between 2000 and 2004 – the last year for which complete data [were then] available on disciplinary action – the police commissioner has rejected the CCRB's findings in 63 percent of those cases. When discipline was imposed, it was strikingly lenient in light of the severity of the misconduct that has been documented by the CCRB.[31]

184.    Similar indifference to substantiated allegations of police misconduct was documented in a 1998 report by the Human Rights Watch.[32]

*E.   The NYPD is Liable for Federal Constitutional Violations By Its Officers Under Monell*

185.    Defendant THE CITY OF NEW YORK and the NYPD established official policies directing and promoting unconstitutional practices by NYPD officers, and have tolerated, condoned and permitted widespread unconstitutional practices by NYPD officers, including the Defendants in this case.

186.    Defendant THE CITY OF NEW YORK indemnifies and shields NYPD officers who repeatedly and habitually violate constitutional rights, such as the Individual Defendants.

187.    Defendant THE CITY OF NEW YORK fails to discipline police misconduct, thereby insuring that such misconduct continues.

---

[31]    Mission Failure: Civilian Review of Policing in New York City (1994-2006), The New York Civil Liberties Union, September 2007.
[32] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.  Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspohtml/toc.htm.

188.    Defendant THE CITY OF NEW YORK fails to control NYPD Precincts or subdivisions in which police misconduct is especially prevalent.

189.    Defendant THE CITY OF NEW YORK implements quotas for individual officers' arrests, thus incentivizing or compelling unconstitutional misconduct by individual officers.

190.    Defendant THE CITY OF NEW YORK tolerates and condones police perjury.

191.    Defendant THE CITY OF NEW YORK implements, tolerates, and fails to punish unlawful strip search practices.

192.    These policies and practices caused the unlawful conduct of the Defendant Police Officers.

193.    As a result, the Plaintiffs' constitutional rights were violated.

194.    As a result, the Plaintiffs were harmed.

195.    Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.


**CLAIMS FOR RELIEF
UNDER NEW YORK STATE LAW**
_____


**SEVENTH CLAIM FOR RELIEF
NEW YORK STATE LAW - BATTERY
AGAINST THE INDIVIDUAL DEFENDANTS**


196.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

197.    The Individual Defendants committed battery upon Plaintiffs through their repeated acts of making bodily contact with Plaintiffs by subjecting them to excessive force in the manner described herein.

198.    The Individual Defendants performed these repeated acts of making bodily contact with Plaintiffs with the intent to do so.

199.    The Individual Defendants' acts of making bodily contact with Plaintiffs were subjectively offensive in nature to Plaintiffs.

200.    The Individual Defendants' acts of making bodily contact with Plaintiffs would be objectively offensive in nature to a reasonable person aware of the circumstances of the Individual Defendants' interactions with Plaintiffs.

201.    The Individual Defendants performed these repeated acts of making bodily contact with Plaintiffs without privilege or consent from Plaintiffs.

202.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

203.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
### NEW YORK STATE LAW - ASSAULT
### AGAINST THE INDIVIDUAL DEFENDANTS

204.    Plaintiffs repeat, re-iterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

205.    The Individual Defendants assaulted Plaintiffs by putting them in apprehension of imminent harmful and offensive bodily contact.

206.    The Individual Defendants' act of threatening the use of physical force against Plaintiffs put Plaintiffs in an apprehension of a battery from the Individual Defendants.

207.    The Individual Defendants' act of threatening the use of force against Plaintiffs would put a reasonable person aware of the circumstances of the incident in question in an apprehension of a battery from the Individual Defendants.

208.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

209.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### NINTH CLAIM FOR RELIEF
### NEW YORK STATE LAW
### NEGLIGENT HIRING AND RETENTION
### AGAINST DEFENDANT THE CITY OF NEW YORK

210.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

211.    Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the hiring and retention of the Individual Defendants who participated in the assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiffs' constitutional rights in the manner described herein.

212.    Defendant THE CITY OF NEW YORK knew, or should have known in the exercise of reasonable care, the propensities of the Individual Defendants to engage in the wrongful conduct heretofore alleged in this complaint.

213.    As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

214.    Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

**TENTH CLAIM FOR RELIEF**
**NEW YORK STATE LAW**
**NEGLIGENT TRAINING AND SUPERVISION**
**AGAINST DEFENDANT THE CITY OF NEW YORK**

215.    Plaintiffs, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

216.    Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of the Individual Defendants who participated in the assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiffs' constitutional rights in the manner described herein.

217.    Defendant THE CITY OF NEW YORK knew, or should have known that the requirements, guidelines, and terms of its training for the Individual Defendants were inadequate to prevent the Individual Defendants from engaging in the wrongful conduct against Plaintiffs heretofore alleged in this complaint.

218.     As a result, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, loss of freedom, and damage to their reputations and standings within their communities.

219.     Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
## NEW YORK STATE LAW - NEGLIGENCE
## AGAINST ALL DEFENDANTS

220.     Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

221.     The Defendants, as a result of having Plaintiffs in their custody, owed a duty to Plaintiffs to prevent them from being subjected to assault, battery, excessive force, unlawful arrests, and other violations of their constitutional rights as described herein.

222.     The Defendants breached this duty by allowing Plaintiffs to be subject to assault, battery, and excessive force, unlawful arrests, and other violations of their constitutional rights as described herein.

223.     The Defendants could have foreseen that breaching their duty of care owed to Plaintiffs while Plaintiffs were in their custody, would lead to Plaintiffs being subjected to assault, battery, excessive force, and other violations of their constitutional rights as described herein.

224.     The Defendants' breach of their duty owed to Plaintiffs while Plaintiffs were in their custody directly and proximately resulted in Plaintiffs being subjected to

assault, battery, excessive force, unlawful arrests, and other violations of their

constitutional rights as described herein.

225.    Plaintiffs received both actual and substantial physical and mental injuries

as a result of the Individual Defendants' breach of their duty owed to them.

226.    As a result, Plaintiffs were caused to suffer personal injuries, violation of

their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages,

loss of freedom, and damage to their reputations and standings within their communities.

227.    Plaintiffs demand judgment against Defendants in a sum of money to be

determined at trial.

**TWELFTH CLAIM FOR RELIEF**
**PUNITIVE DAMAGES**
**AGAINST THE INDIVIDUAL DEFENDANTS**

228.    The actions of the Individual Defendants constituted intentional violations

of federal and state law.

229.    The actions of the Individual Defendants were motivated by evil motive or

intent, or involved involves reckless or callous indifference to the constitutionally

protected rights of the Plaintiffs.

230.    As a result, Plaintiffs are entitled to an award of punitive damages against

each of the Individual Defendants in an amount to be determined at trial.


WHEREFORE and in light of the foregoing, it is respectfully requested that the

Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorney's fees and costs.

[e] Award such other and further relief as the Court deems to be proper and in the interests of justice.

DATED:        New York, New York
              December 20, 2013

                                Respectfully submitted,

                                WYLIE M. STECKLOW [WS 6012]
                                Stecklow Cohen & Thompson
                                10 SPRING STREET – SUITE 1
                                New York, New York 10012
                                Phone: [212] 566-8000
                                Fax:  [212] 202-4952
                                ATTORNEY FOR PLAINTIFFS